LAURA GOODLOE,

      Plaintiff,

v.

ROYAL CARIBBEAN CRUISES, LTD.,

      Defendant.

_____/

## ORDER

**THIS CAUSE** came before the Court upon Defendant, Royal Caribbean Cruises, LTD.'s

Rule 50(b) Motion for Judgment as a Matter of Law ("JMOL Motion") [ECF No. 161] and Motion

for New Trial or Remittitur ("New Trial Motion") [ECF No. 160]. The Court has carefully

considered the parties' written submissions,[1] the record, and applicable law.

## I.     RELEVANT BACKGROUND[2]

This case involves claims arising out of the death of cruise ship passenger, Richard J.

Puchalski. (*See generally* Amended Complaint [ECF No. 30]). Plaintiff, Laura Goodloe, is

Puchalski's daughter and the appointed personal representative of his Estate.[3] (*See id.* ¶ 2).

Defendant, Royal Caribbean, is a Liberian corporation with its principal place of business in

Miami, Florida. (*See id.* ¶ 4).

---

[1] The written submissions are Plaintiff Laura Goodloe's Response ("JMOL Response") [ECF No. 167] to the JMOL Motion and Response ("New Trial Response") [ECF No. 165] to the New Trial Motion; and Defendant's Reply ("JMOL Reply") [ECF No. 171] to the JMOL Motion and Reply ("New Trial Reply") [ECF No. 170] to the New Trial Motion.

[2] This Order only addresses the facts relevant to the issues raised by the parties in their briefing.

[3] Puchalski was a citizen of Wisconsin and his estate is being administered by the Circuit Court of Kenosha County, Wisconsin. (*See* Am. Compl. ¶ 2).

On July 31, 2016, Puchalski was a passenger on Royal Caribbean's vessel, the Explorer of the Seas, which was docked in Juneau, Alaska. (*See id.* ¶ 8). That morning, Puchalski presented to the vessel's infirmary with shortness of breath. (*See id.* ¶¶ 9–10). He was evaluated by the vessel's physician, Dr. Amanda Saunders. (*See id.* ¶ 10). After she performed an EKG, Dr. Saunders prescribed and dispensed medications to Puchalski but did not transfer him to a hospital ashore or perform any further testing or evaluation. (*See id.*).

The parties dispute the circumstances surrounding Puchalski's departure from the medical facility. According to Plaintiff, Puchalski was discharged by Dr. Saunders and returned to his cabin relying on her advice. (*See id.* ¶ 11). In contrast, Defendant asserted the affirmative defense of comparative negligence, arguing Dr. Saunders did not agree with Puchalski leaving the medical facility and that he did so against her advice. (*See* Trial Tr. Day 4 [ECF No. 176] 91:10–92:8). Although Dr. Saunders' version of events is not corroborated by her contemporaneous medical records, Dr. Saunders stated she informed Defendant of these circumstances during the litigation, in September or October of 2018. [4] (*See* Saunders' Dep. [ECF No. 84-1] 18:11–12). In any event, Dr. Saunders' version of events was not disclosed to Plaintiff until her deposition, less than two months before the trial.[5]

In a pretrial motion for sanctions, Plaintiff argued Defendant ambushed her by disclosing surprise testimony regarding Puchalski's comparative negligence. (*See generally* Mot. for Sanctions). Plaintiff stated Dr. Saunders' testimony that Puchalski left the medical facility against her advice was inconsistent with Defendant's earlier discovery answers and the information

---

[4] Defendant insists it was not aware of Dr. Saunders' version of events until the day prior to her January 11, 2019 deposition. (*See* Opposition to Motion for Sanctions [ECF No. 81] 11).

[5] The timing and relevance of this disclosure are contested. The issue was addressed in Plaintiff's Motion for Sanctions [ECF No. 74] and again at a March 1, 2019 Pre-Trial Conference [ECF No. 175].

provided by Defendant's experts. (*See id*. ¶¶ 8–10). The Motion was referred to a magistrate judge (*see* Order [ECF No. 75]), who found sanctions were not justified but that Plaintiff could elicit testimony as to the timing of Defendant's discovery and disclosure to Plaintiff of Dr. Saunders' version of events. (*See* Judge Goodman's Order [ECF No. 93]).

 Defendant objected to the magistrate judge's Order (*see* Objections [ECF No. 115]), and at the Pre-Trial Conference argued it would be prejudicial to allow Plaintiff to question Dr. Saunders regarding when she disclosed her recollection to Defendant's counsel because the jury might fault defense counsel for not providing this information to Plaintiff earlier. (*See* Pretrial Conference Tr. 4:15–11:14). The Court denied Defendant's objections, finding the magistrate judge "was eminently correct in . . . the balance that he struck and in how he resolved this difficult issue." (*Id*. 16:7–9 (alteration added)).

Following the disputed circumstances surrounding his exit from the medical facility, Puchalski returned to his cabin and was joined by his son, Cliff Puchalski. (*See id*. ¶¶ 11–12). When Puchalski rose to use the restroom, he collapsed. (*See id*. ¶ 12). Cliff called the vessel's emergency number, and two nurses arrived. (*See id*.). Puchalski was then transported to the on-board medical center. (*See id*.). That afternoon, Puchalski was transferred to Bartlett Regional Hospital in Juneau for further treatment. (*See id*. ¶¶ 13–14). After assessment, Puchalski was airlifted to an ICU in Anchorage, Alaska. (*See id*. ¶ 14). Puchalski's condition deteriorated, and he passed away on August 4, 2016. (*See id*. ¶ 15).

On March 23, 2018, Plaintiff filed this lawsuit against Royal Caribbean. (*See* Complaint [ECF No. 1]). The Amended Complaint describes the two claims for relief as: (1) Negligent

Medical Care and Treatment Via Employees or Actual Agents and (2) Negligence (Vicarious Liability of Royal Caribbean based Upon Apparent Agency). (*See* Am. Compl. 4–10).[6]

In a pretrial Amended Motion to Strike Plaintiff's Experts [ECF No. 48], Defendant argued Plaintiff's expert, Dr. Kim Klancke, lacked the necessary qualifications to testify on the issues. (*See id*. 6–11). The Court entered an Order [ECF No. 63] denying the Amended Motion as to Dr. Klancke. (*See id*. 1).

Also prior to trial, the parties filed trial briefs in support of their respective positions on the applicable wrongful death remedies in this action. (*See* Trial Briefs [ECF Nos. 130, 138]). At the pre-trial conference, the parties agreed to have the Court to resolve the issue post-trial. (*See* Pre-Trial Conference Tr. 17:1–24).

A four-day jury trial concluded on March 7, 2019. (*See* Trial Transcripts [ECF Nos. 176–179]). On the second day of the proceedings, Defendant asked the Court for a curative instruction regarding Plaintiff's statements discussing the absence of a Nurse Coatzee. (*See* Trial Tr. Day 2 296:9–23). The Court declined to issue a curative instruction. (*See id*. 298:1–3).

At the close of Plaintiff's case-in-chief, Defendant moved for a directed verdict under Federal Rule of Civil Procedure 50(a). (*See* Trial Tr. Day 3 113:8–22). Once more, Defendant argued Dr. Klancke lacked the qualifications to testify as to the standard of care. (*See id*.). The Court again denied the motion. (*See id*. 113:23–25).

During the proceedings, Defendant moved for a mistrial after Plaintiff briefly showed the jury and attempted to use unadmitted evidence, referred to here as the un-redacted "Providence Record," to impeach Defendant's expert. (*See id*. 217:13–20). After hearing arguments from the parties, the Court denied the motion but provided a curative instruction. (*See id*. 228:17–20). At

---

[6] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

the close of the evidence, Defendant renewed its motion for a mistrial on this basis, which the Court again denied. (*See id*. 251:19–252:20).

The jury returned a verdict finding Defendant's negligence was a legal cause of damage to Richard J. Puchalski. (*See* Verdict [ECF No. 152] 1). The jury determined Defendant was responsible for 70 percent of the damages and awarded Plaintiff $265,000[7] in medical expenses and $4,800,000 for loss of companionship and protection and for Plaintiff's past and future pain and suffering. (*See id*. 2). The Court entered Final Judgment [ECF No. 153] in favor of Plaintiff and against Defendant in the amount of $3,384,073.22. (*See* Final Judgment ¶ 2).

Defendant now asks the Court for judgment in its favor as a matter of law, or alternatively to grant it a new trial. (*See generally* JMOL Mot.; New Trial Mot.). If the Court declines to grant either of these forms of relief, Defendant requests the Court reduce the jury's award and limit Plaintiff's recovery through remittitur. (*See* New Trial Mot. 14–20).

## II.     ANALYSIS

The Court first briefly considers Defendant's JMOL Motion, followed by the New Trial Motion, including the request for a remittitur of the Final Judgment.

### A.     JMOL Motion[8]

The renewed request for judgment as a matter of law is straightforward: Defendant insists the verdict cannot be sustained because Plaintiff presented no evidence from a qualified medical

---

[7] The parties stipulated to reduce the $265,000 awarded as medical expenses to $34,390.32. (*See* Trial Tr. Day 4 83:24–85:10; Final Judgment ¶ 2).

[8] Federal Rule of Civil Procedure 50(b) governs a renewed motion for judgment as a matter of law. Under this standard, a "district court should grant judgment as a matter of law when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action." *Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1278 (11th Cir. 2005) (citation omitted). Conversely, the court should deny the motion "if the plaintiff presents enough evidence to create a substantial conflict in the evidence on an essential element of the plaintiff's case." *Id.* (citations omitted). The Court does not perform a Rule 50(b) analysis for the reasons explained in this Order.

expert on the applicable standard of care. Defendant explains that as a cardiologist, Dr. Klancke lacks the required expertise to testify as an expert in emergency medicine. (*See* JMOL Mot. 3). According to Defendant, because Plaintiff did not present a qualified medical expert to testify as to the standard of care, breach, or causation, the case should not have gone to the jury and it is entitled to judgment as a matter of law notwithstanding the verdict. (*See id.* 5–6).

Defendant's position regarding Plaintiff's expert has been advanced twice before. (*See* Am. Mot. to Strike Pl.'s Experts 6–11; Trial Tr. Day 3 113:8–22). As explained, the Court denied Defendant's motions each time. (*See* December 21, 2018 Order 1; Trial Tr. Day 3 113:23–25). Undeterred, Defendant again brings the same argument without raising any issues not previously considered by the Court and without offering any novel or revised legal arguments or authorities. (*See generally* JMOL Mot.). Indeed, much of the present JMOL Motion is identical to the previous Amended Motion to Strike. (*Compare* Am. Mot. to Strike Pl.'s Experts 9–11 *with* JMOL Mot. 3–5).

The arguments repeated in the present JMOL Motion are no more persuasive now than they were before. The Court is satisfied with its prior decisions on this issue for the reasons previously articulated and consequently does not address the JMOL Motion further. *See Costa v. Sam's E., Inc.*, No. Civ. A. 11-0297-WS-N, 2012 WL 5386921, at *4 (S.D. Ala. Oct. 31, 2012) ("In the context of [a] Rule 50/Rule 59 Motion, no constructive purpose would be served by the Court reiterating the reasoning and conclusions of [an earlier] Order in detail. . . . Summary disposition of this issue is warranted." (alterations added; citations omitted)).

## B. New Trial Motion

A motion for a new trial under Federal Rule of Civil Procedure 59(a) may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court."

Fed. R. Civ. P. 59(a)(1)(A). Although a comprehensive list of the grounds for granting a new trial is elusive, the Supreme Court has held that a motion for a new trial may rest on the fact "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). "[W]hen considering a motion for new trial, the trial judge may weigh the evidence, but it is proper to grant the motion only if the verdict is against the great, not just the greater, weight of the evidence." *Ard v. Sw. Forest Indus.*, 849 F.2d 517, 520 (11th Cir. 1988) (citing *Watts v. Great Atl. & Pac. Tea Co., Inc.*, 842 F.2d 307, 310 (11th Cir. 1988) (alteration added)).

In its New Trial Motion, Defendant asserts: (1) the Court's rulings allowed Plaintiff to build the improper and prejudicial theme at trial that Royal Caribbean was hiding the truth from the jury (*see* New Trial Mot. 2–13); (2) Dr. Klancke lacked the qualifications to testify as an expert on the standard of care (*see id*. 13–14); and (3) if a new trial is not granted, the Court should at least order remittitur (*see id*. 14–20). The Court addresses each argument in turn.

1.     *Improper and Prejudicial Themes at Trial*

Defendant argues "various pretrial and trial rulings allowed Plaintiff's counsel to build the powerful but improper theme at trial that [Royal Caribbean] and its counsel was [sic] keeping the truth from the jury." (*Id*. 2 (alterations added)). The specific events complained about are: (a) Plaintiff publishing to the jury prejudicial evidence the parties agreed was inadmissible — the unredacted Providence Record — and then pouncing upon it in closing argument (*see id*. 2–10); (b) Plaintiff improperly commenting on Defendant's decision not to call witnesses (*see id*. 10–11);

and (c) addressing when Dr. Saunders first informed counsel about Puchalski leaving the medical facility against medical advice (*see id.* 11–13).

### a) Inadmissible Evidence Published to the Jury

Defendant's argument regarding inadmissible evidence coming before the jury involves Plaintiff showing the jury the un-redacted Providence Record, a medical record from the Providence Alaska Medical Center. According to Defendant, the parties agreed before trial the Providence Record contained inadmissible speculation regarding the cause of Puchalski's death. (*See id.* 2). Nevertheless, Plaintiff proceeded to show the un-redacted portion of the Record to the jury, and Defendant objected and moved for a mistrial. The Court denied the requested mistrial but provided a curative instruction. (*See* New Trial Mot. 3 (citations omitted)).

Defendant insists its "core defense" was that the medications prescribed and administered aboard the vessel were proper. (*Id.*). The speculation of a non-testifying, third-party who was not subject to cross-examination purportedly undermined its defense by allowing the jury to believe the shipboard physician committed malpractice by administering inappropriate medications. (*See id.*). Defendant states "the extremely prejudicial nature of this surprise evidence cannot be disputed, particularly as Plaintiff agreed to its redaction from the exhibit pretrial." (*Id.*).

In addition to Plaintiff's publication of the un-redacted Providence Record, Defendant accuses Plaintiff's counsel of seizing upon the Court's ruling about his wrongful disclosure to Defendant's detriment in rebuttal closing argument. (*See* New Trial Mot. 7 (alteration added)). Defendant argues Plaintiff's counsel used the redacted record to imply "he had been precluded by the redaction from bringing such evidence to the jury that would be helpful to Plaintiff." (*Id.* 8). Defendant emphasizes the following statements as unfairly prejudicial:

> [Plaintiff's counsel]: Well, we can't show any document at all that shows the final cause because it's the [sic] against the Rules of Evidence.

[Plaintiff's counsel]: You are going to get every medical report back there, and you are going to see that there's [sic] parts in it [sic] that are redacted.

[Plaintiff's counsel]: We can't get into what it says one way or another, but as far as our ability to show you anything about a determined cause, there is no way for us to do that.

(New Trial Mot. 8–9 (alterations added; citations and emphasis omitted)). Defendant insists these statements made it clear to the jury Plaintiff sought to present that evidence, but the Court's ruling — at Defendant's request — prevented Plaintiff from doing so. (*See id*. 9).

According to the Plaintiff, the Record was perfectly admissible; it simply had not yet been admitted. (*See* New Trial Resp. 3). Plaintiff states her "pretrial acquiescence" to Defendant's requested redactions did not make an otherwise admissible exhibit inadmissible. (*See id*.). Plaintiff describes as proper the use of the un-redacted Providence Record given Defendant tried to bolster its expert's opinion with Providence Hospital records. (*See id*. 4). Plaintiff provides the following exchange between Royal Caribbean and its expert by way of example:

Q. Was there anything in the record from Bartlett or Providence that would change your opinions in this particular case.

A. No, it didn't change my opinion, actually it confirmed my opinion because I think you've probably seen that the Bartlett physicians and then the Providence physicians all said, we do not know what caused this PEA. And that's expected.

(*Id*. (citation and emphasis omitted)). Plaintiff states the portions redacted from the Providence Record did not support the witness's opinion, and Defendant exposed the witness to impeachment under Federal Rule of Evidence 705, which permits otherwise inadmissible evidence upon which an expert has relied to be used to impeach the expert's opinion. (*See id*.).

Plaintiff also notes the Court provided a curative instruction, and the instruction is presumed to be effective. (*See id*. 8). The Court was willing to provide a second curative instruction, but Defendant withdrew the request for one. (*See id*.). Plaintiff argues the un-redacted

Providence Record is substantially similar to other evidence admitted at trial and any error by Plaintiff was harmless. (*See id.*).

Regarding Plaintiff's counsel's statements in closing arguments, Plaintiff states Defendant placed itself in the position about which it now complains. (*See id.* 9). Plaintiff insists her statements were a response to the following "improper" challenges made to Plaintiff's counsel during Defendant's closing:

> You know what? Mr. Haggard, and I'm not sure if he is coming up again, it might be Mr. Michaels that comes up again, here is the evidence. . . . These are the documents you're going to have. **Ask him pull one sheet of paper out of here, one sheet that shows you that the combination of these drugs causes death in somebody with AFib and congestive heart failure. One document, just one**. . . .
>
> Look at what wasn't shown to you. Keep going. At Providence, right, **if you think the drugs are causing the problem, if you think this deadly cocktail caused the PEA, isn't Providence going to say that? Aren't the doctors going to find that out**? They know, they have the history. . . . Where is the P – **where is the Providence record that says the mixture of the captopril and the metoprolol caused his death**? You know what it says? We don't know what caused the PEA. We are just as clueless as the ship's doctor. We don't know.
>
> . . . Why didn't they show you that portion of the record that says they don't know what happened at Providence? Why don't they pull out the record from Bartlett? **Why don't they pull out the record from Providence that says the combination of the medications kill him**?
>
> Here are the records. You're going to have them. You're going to have them. Providence is 14. This is the evidence in this case. **You will have it. Look for it. Look for it, please**. And if you find it, okay, **I can tell you it is not in here because it doesn't exist**. . . .

(New Trial Resp. 9–10 (citations omitted; emphasis in original; alterations added)). Plaintiff argues Defendant misrepresented evidence it had successfully excluded. (*See id.* 11). While Plaintiff was prohibited from showing the jury the portions of the records redacted at Defendant's request, she insists she was not prohibited from explaining to the jury why the Plaintiff could not do so. (*See id.*).

Defendant relies on *Ad-Vantage Telephone Directory Consultants, Inc. v. GTE Directories Corporation*, 37 F.3d 1460 (11th Cir. 1994), to support its claim it is entitled to a new trial due to the issues surrounding the Providence Record. (*See* New Trial Mot. 3–4). In *Ad-Vantage*, the Eleventh Circuit granted a new trial after inadmissible evidence was presented to the jury. *See id*. at 1466. *Ad-Vantage* sets out the relevant factors to consider in determining whether to grant a new trial when inadmissible evidence is shown to a jury. The Eleventh Circuit identified the following factors: "the number of errors, the closeness of the factual disputes, the prejudicial effect of the evidence, the instructions given, and whether counsel intentionally elicited the evidence and focused on it during the trial." *Id*. at 1465 (citation omitted). In *Ad-Vantage*, "although the errors were few, the disputed facts were close, the evidence was highly prejudicial, no correcting instructions were given, and the inadmissible evidence was not only intentionally elicited but also emphasized in closing argument." *Id*.

"Not every evidentiary error . . . requires reversal." *Peat, Inc. v. Vanguard Research, Inc*., 378 F.3d 1154, 1162 (11th Cir. 2004). "[A] new trial is warranted only where the error has caused substantial prejudice to the affected party." *Knight through Kerr v. Miami-Dade Cty*., 856 F.3d 795, 815 (11th Cir. 2017) (alteration added; internal quotation marks and citation omitted). "[T]he inquiry is always directed to the same central question — how much of an effect did the improperly admitted or excluded evidence have on the verdict?" *Peat, Inc.*, 378 F.3d at 1162 (alteration added).

Applying the relevant factors to the issues presented here, the Court finds Defendant is not entitled to a new trial. Plaintiff's brief display of the un-redacted portion of the Providence Record and references to it in closing argument did not cause "substantial prejudice" to the Defendant that would necessitate a new trial. *Knight through Kerr*, 856 F.3d at 815.

First, the un-redacted Providence Record is substantially similar to other evidence properly admitted. This is made clear by comparing an admitted trial exhibit with the un-redacted Providence Record. Joint Exhibit 14 005 [ECF No. 154-12] 6, states:

> - pea arrest: etiology is unclear to me. W/ his cardiomyopathy, i wonder if he developed flash pulm edema - > hypoxic --> arrest. Reported rose w/ intubation, but no acls drugs. He could of [sic] been in decompensated hf w/ beta blocker tipping him. Unlikely pe as he was on xarelto. No infiltrate seen on cxr to suggest infectious.

(*Id.*). The un-redacted Providence Record – briefly displayed to the jury and not admitted as evidence at trial – states:

> 1. Cardiac arrest. PEA arrest per report, I wonder if patient was excessively hypotensive following medical treatment of his atrial fibrillation with rapid ventricular rates. He might have significant underlying cardiomyopathy and IV beta blocker, fairly high dose of captopril and IV Lasix might have resulted in an acute decompensation.

(*Id.*).

While Defendant argues the un-redacted Providence Record is not materially similar to the admitted evidence because it does not state the cause of Puchalski's condition was unknown and it specifically mentions the medications Defendant maintains were properly administered (*see* New Trial Reply 3), the quoted Joint Exhibit and the un-redacted Providence Record include the same speculation regarding the potential interaction between the medical treatment and Puchalski's condition. The admitted record shows "[Puchalski] could [have] been in decompensated hf w/ [the medical treatment] tipping him." (Joint Exhibit 14005 (alterations added)). Although the un-redacted Providence Record does not contain the disclaimer Defendant would prefer, the speculative nature of the record as to potential causes of Puchalski's condition is clear.

Defendant also fails to explain how the mere reference to specific medications caused it substantial prejudice. The jury was aware of the medications Dr. Saunders administered to

Puchalski. (*See, e.g.*, Trial Tr. Day 4 (defense counsel addressed the records in question: "[The doctors] know, they have the history. They have been told what he's been given. The Captopril, the Metoprolol." (alteration added))). Given the jury's awareness, it is unclear how an additional reference to the medications caused prejudice. *See Drew P. v. Clarke Cty. Sch. Dist.*, 877 F.2d 927, 932 (11th Cir. 1989) (finding harmless error where improperly admitted evidence merely added to other evidence that was properly admitted).

Further, when the un-redacted Providence Record was briefly published, the undersigned sustained Defendant's objection and provided the following curative instruction:

> Ladies and gentlemen, you saw a document placed on the ELMO right before we took this break. If you were able to read any of it before we took it off the ELMO, please disregard what you read and do not consider that.

(Trial Tr. Day 3 228:17–20). In sustaining the objection and limiting any potential prejudice through its instruction, the Court mitigated the possibility the jury would be persuaded by any impropriety. *See Allstate Ins. Co. v. James*, 845 F.2d 315, 319 (11th Cir. 1988). Certainly, "[a] curative instruction purges the taint of a prejudicial remark because a jury is presumed to follow jury instructions." *Ocean View Towers Ass'n, Inc. v. QBE Ins. Corp.*, No. 11-60447-CIV, 2012 WL 882577, at *6 (S.D. Fla. Mar. 15, 2012) (quoting *United States v. Simon*, 964 F.2d 1082, 1087 (11th Cir. 1992) (alteration added)).

The Court is also unpersuaded that Plaintiff's counsel's statements alluding to the un-redacted Providence Record during closing arguments "standing alone, require a new trial." (New Trial Mot. 10). "The standard for determining whether a jury verdict should be set aside as a result of misconduct of counsel is whether the conduct was 'such as to impair gravely the calm and dispassionate consideration of the case by the jury.'" *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1474 (11th Cir. 1992) (citation omitted). Plaintiff's counsel's

statements, in conjunction with the earlier publishing of the un-redacted evidence, striking of the same, and curative instruction, do not rise to a level that "impair[ed] gravely" the fairness of the trial. *BankAtlantic*, 955 F.2d at 1474 (alteration added; citation omitted). As any errors at trial were few, the evidence was not highly prejudicial, and a corrective instruction was given, Defendant was not substantially prejudiced. *See Ad-Vantage*, 37 F.3d at 1465.

 b) <u>Defendant's Decision Not to Call Witnesses</u>

 Defendant argues it was prejudiced by Plaintiff counsel's comments regarding the absence of Nurse Coetzee at trial. (*See* New Trial Mot. 10–11). Defendant refers to the following exchanges from trial:

> Q. And have you ever seen any testimony from that nurse?
> A. Yes, I have.
>
> Q. Not from Nurse Sbircea. From Nurse Cutsi [sic].
> A. Oh. No. I haven't seen any testimony from her.
>
> Q. Have you ever seen a shred of testimony by Nurse Cutsi [sic] in this case?
> A. No.

(*See* New Trial Mot. 10–11 (citing Trial Tr. Day 2 187:21–24, 294:2–4)). Defendant states Plaintiff's counsel asked the jury to draw an adverse inference against it for not presenting Nurse Coetzee, insinuating Defendant did not call her because her testimony would have been harmful to the defense. (*See id.*). Defendant insists there has been no showing it had the ability to produce this South African witness to testify and the assertion of an adverse inference further prejudiced the Defendant. (*See id.* 11).

 Plaintiff states she did not request an adverse inference instruction but had the right to argue for such an inference as Royal Caribbean failed to establish Nurse Coetzee was equally accessible to both parties. (*See* New Trial Resp. 12–13 (citing *United States. v. Chapman*, 435 F.2d 1245, 1247 (5th Cir. 1970))). Both parties acknowledge the Court ruled on this issue outside the jury's

presence when Royal Caribbean sought a curative instruction. (*See* New Trial Mot. 11; New Trial Resp. 13).

Considering the cited exchanges, the undersigned does not agree Defendant was prejudiced by the references to Nurse Coetzee. Notably, *after not objecting*, Defendant sought a curative instruction, which the Court declined to issue, stating:

> I'm sure the defense can explain to the jury Nurse Cutsi's [sic] relationship or lack thereof with the Defendant in your case in chief. I don't need to give an instruction based on disputed facts as are being presented here.

(Trial Tr. Day 2, 297:24–298:3).

The Court finds no prejudice to Defendant, and hence no right to a new trial, from the identified statements, especially given Defendant's opportunity to address through testimony and evidence any incorrect suggestion made by Plaintiff that the Nurse was not equally available to both parties.

### c) Puchalski Leaves the Medical Facility Against the Doctor's Advice

Defendant next argues it was unduly prejudicial to allow Plaintiff to examine Dr. Saunders regarding when she first informed defense counsel Puchalski left the medical facility against her advice, and further, to use Defendant's inconsistent interrogatory answer regarding comparative fault on this issue. (*See* New Trial Mot. 11–13). Defendant states even if it was proper to impeach Dr. Saunders' credibility, "Plaintiff's counsel went beyond that issue and used the pretrial ruling to advance the trial theme that [Royal Caribbean] was hiding behind the rules of evidence to obscure the truth." (*Id*. 11 (alteration added)).

The Court is not persuaded Defendant was unduly prejudiced by testimony and evidence regarding this issue. The matter was addressed pretrial, and Defendant made a similar argument it would be prejudicial to allow this line of questioning. (*See* Pre-Ttrial Conference Tr. 4:15–

16:24). After hearing arguments by each side, and denying Defendant's request the issue not be raised before the jury, the undersigned stated:

> Her credibility is key. I am not going to tie the Plaintiff's hands. It's -- her testimony regarding this event, which is not reflected in her records, it borders on the incredible, and the Plaintiff is entitled to have the jury draw that credibility finding against her. And the only way it can draw that credibility finding against her is to probe this recent favorable fact that the Defendant had all along that was just revealed less than two months before trial.

(*Id*. 14:20–15:3). The undersigned stands by her prior ruling. It was not unduly prejudicial for Plaintiff to draw the jury's attention to credibility concerns regarding Dr. Saunders' version of events.

\*     \*     \*

Defendant goes on to argue Plaintiff's counsel used multiple trial rulings together to build the powerful but improper theme at trial that Defendant and its counsel were keeping the truth from the jury. (*See* New Trial Reply 1). Defendant insists even if any one of these rulings was harmless in isolation, together they denied Defendant a fair trial. (*See id*.).

The undersigned disagrees. The Court issued a curative instruction regarding the unredacted and briefly displayed Providence Record, which was materially similar to other evidence; Plaintiff's statements regarding Nurse Coatzee did not prejudice Defendant given Defendant's opportunity to address any perceived harm; and it was not unduly prejudicial for Plaintiff to probe credibility concerns regarding Dr. Saunders' testimony. "None of the identified 'errors'— taken individually or together — persuade [the undersigned] that the jury was prevented from rendering a just and appropriate verdict." *Eghnayem v. Bos. Sci. Corp.*, No. 1:14-CV-024061, 2016 WL 4051311, at *17 (S.D. Fla. Mar. 17, 2016) (alteration added).

2.      *Dr. Klancke's Qualifications to Testify on the Standard of Care*

Defendant again argues the Court should have excluded Dr. Klancke's testimony because he is not qualified to opine whether Dr. Saunders breached the standard of care of a shipboard emergency physician. (*See* New Trial Reply 8). Because Defendant relies on the same reasoning to support its arguments here as in its JMOL Motion, which the Court has rejected *supra*, a new trial is not warranted on this basis.

3.      *Whether Defendant is Entitled to a Remittitur*

Defendant states it is entitled to a remittitur (1) as a matter of law because Plaintiff is permitted only pecuniary damages under general maritime law; and (2) because the damage award was excessive, likely inflamed by undue passion based on counsel's arguments. (*See* New Trial Mot. 14–20). The Court addresses each argument in turn.

a.      Remittitur as a Matter of Law

Defendant states general maritime law governs and limits Plaintiff's recovery to pecuniary losses. (*See id*. 15). Certainly, general maritime law may be supplemented by state wrongful death statutes where a death occurs aboard a vessel in state territorial waters. (*See id*.). According to Defendant, the choice-of-law analysis in maritime cases is governed by the factors in *Lauritzen v. Larsen*, 345 U.S. 571, 582–93 (1953), which here point to the application of Wisconsin law. (*See id*. 15–18). Under Wisconsin's wrongful death statute, there is no additional remedy to supplement general maritime law, so Plaintiff is limited to pecuniary losses under general maritime law. (*See id*. 18–19).

Plaintiff disagrees, stating the Court should apply the forum's choice-of-law rules because while maritime law may generally apply to this action, the Amended Complaint only alleges diversity jurisdiction under 28 U.S.C section 1332. (*See* New Trial Resp. 16 (alteration added;

emphasis omitted)). Plaintiff states the Court should apply the forum's false conflict analysis and find Florida law – which allows the recovery of damages for loss of companionship and protection and for mental pain and suffering – applies. (*See id*. 17–18). Were the Court to entertain a conflict-of-law analysis as between Florida and Wisconsin, Plaintiff asserts the Court must follow the most significant relationship test outlined in the Restatement (Second) of Conflicts of Law section 6. (*See id*. 18). Under Plaintiff's framework, Florida has the most significant relationship to the action. (*See id*. 19–23).

i.      False Conflict Analysis

The Court "must first decide whether there is a true conflict between the states' laws before applying a state's choice-of-law rules." *Gomez v. California*, No. 15-24483-CV, 2016 WL 9632878, at *4 (S.D. Fla. Apr. 6, 2016) (citation omitted). Wisconsin's wrongful death statute — which includes a limit on non-economic damages — does not apply to deaths occurring outside Wisconsin. *See* Wis. Stat. § 895.03. Florida's wrongful death act contains no such jurisdictional limits or damage caps. *See* Fla. Stat. §§ 768.16–768.26.

Plaintiff argues a false conflict exists because "while the Wisconsin and Florida Wrongful death statutes are not the same, they 'produce the same outcome under the facts of the case.'" (New Trial Resp. 17 (citation omitted)). Plaintiff relies on *Waranka v. Wadena Insurance Company*, 353 Wis. 2d 619, 847 N.W.2d 324 (2014), to conclude Wisconsin courts would not apply the Wisconsin damage cap here. (*See* New Trial Resp. 18). A false conflict is presented because under either state's law, Plaintiff's damages would not be capped. (*See id*.).

At the outset, the Court addresses Plaintiff's assertion regarding subject matter jurisdiction. It is irrelevant that the only basis for jurisdiction alleged is diversity jurisdiction. "Even when the parties allege diversity of citizenship as the basis of the federal court's jurisdiction . . . if the injury

occurred on navigable waters, federal maritime law governs the substantive issues in the case."
*Everett v. Carnival Cruise Lines*, 912 F.2d 1355, 1358 (11th Cir. 1990) (alterations added; citation
omitted); *see also Balaschak v. Royal Caribbean Cruises, Ltd.*, No. 09-21196-CIV, 2009 WL
8659594, at *2 n.5 (S.D. Fla. Sept. 14, 2009).

This action arose out of conduct occurring on a cruise ship in navigable waters (*see* New
Trial Resp. 16), and the parties stipulated maritime jurisdiction exists (*see* Pretrial Stipulation [ECF
No. 65] 3). The action is governed by general maritime law. The significance of this conclusion
is that "general maritime law does not allow plaintiffs in a wrongful-death action brought on behalf
of a nonseafarer . . . to seek emotional damages" such as pain and suffering. *Pucci v. Carnival
Corp.*, 160 F. Supp. 3d 1329, 1331–32 (S.D. Fla. 2016) (alteration added). Plaintiff can only
recover non-pecuniary damages if such damages are provided by a state's wrongful-death statute
that supplements general maritime law. *See id.* at 1335–1336; *Yamaha Motor Corp., U.S.A. v.
Calhoun*, 516 U.S. 199, 216 (1996) (holding state statutes may supplement general maritime law
for deaths within territorial waters).

The parties agree the Wisconsin wrongful-death statute does not apply to deaths that occur
outside Wisconsin. (*See* New Trial Resp. 22; New Trial Reply 11). Wisconsin law therefore fails
to provide any supplemental remedy allowing Plaintiff to recover non-pecuniary damages not
provided for under general maritime law. In contrast, Florida law provides supplemental remedies
in addition to those available under general maritime law. "Florida law is rather straightforward,
permitting 'survivors,' . . . to collect the value of lost support and services, future loss of support
and services, loss of companionship or parental companionship, mental pain and suffering, medical
or funeral expenses, loss of earnings, and net accumulations." *Piamba Cortes v. Am. Airlines, Inc.*,
177 F.3d 1272, 1299 (11th Cir. 1999) (alteration added; citation omitted). Application of

Wisconsin law would lead to a result at odds with the application of Florida law. Consequently, there is no false conflict,[9] as the laws of the different states would not "produce the same outcomes under the facts of the case." *Gomez*, 2016 WL 9632878, at *4 (citation omitted). The Court now turns to Defendant's suggested analysis.

ii.       Choice-of-Law Analysis

"As this case lies in admiralty, federal maritime conflict of laws control." *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1161 (11th Cir. 2009) (citation omitted). *See also Blue Whale Corp. v. Grand China Shipping Dev. Co.*, 722 F.3d 488, 498 (2d Cir. 2013) ("Thus, when parties properly invoke admiralty jurisdiction, courts apply federal maritime choice-of-law rules." (citation omitted)). The Supreme Court has set out several factors to determine the choice of law in admiralty cases. *See Lauritzen*, 345 U.S. at 582–93; *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 308–10 (1970). The Supreme Court in *Lauritzen* identified seven relevant factors: the (1) place of the wrongful act, (2) law of the flag, (3) allegiance or domicile of the injured, (4) allegiance or domicile of the defendant shipowner, (5) place of contract, (6) inaccessibility of a foreign forum, and (7) law of the forum. *See Lauritzen*, 345 U.S. at 582–93. In addition, courts consider whether the defendant has a base of operations in the United States. *See Rhoditis*, 398 U.S. at 309. These

---

[9] A false conflict may also exist when "the policies of one sovereign would be furthered by the application of its laws while the policy of the other sovereign would not be advanced by the application of its laws." *Gevaerts v. TD Bank, N.A.*, 56 F. Supp. 3d 1335, 1338 (S.D. Fla. 2014) (citation omitted). This situation arises when the "significant relationships should heavily, if not exclusively, favor one state." *Tune v. Philip Morris Inc.*, 766 So. 2d 350, 353 (Fla. 2d DCA 2000) (internal quotation marks omitted).

A false conflict arguably exists here as Wisconsin does not have an applicable wrongful death statute, while Florida does. The parties do not address this variety of false conflict in their briefing, and the Court does not dispose of the choice-of-law issue on this basis. In any event, this category of false conflict "should always reach the same result" as a full choice-of-law analysis. *Id.*

factors are not an exhaustive list, and the test is not a mechanical one. *See Szumlicz v. Norwegian America Line, Inc.*, 698 F.2d 1192, 1195 (11th Cir. 1983) (citation omitted).

Defendant acknowledges "many of the [*Lauritzen*] factors would not apply where, as here, the dispute concerns entirely domestic interests." (New Trial Mot. 16 (alteration added) (citing *Calhoun v. Yamaha Motor Corp., U.S.A.*, 216 F.3d 338, 346 (3d Cir. 2000))). Defendant identifies the following facts as weighing against the application of Florida law: Puchalski and his wife lived in Wisconsin, the trip was booked in Wisconsin, the trip commenced in Wisconsin, the Estate is being administered in Wisconsin, and none of the wrongful acts occurred in Florida. (*See* New Trial Reply 11). Defendant states the only factors favoring application of Florida law are the Florida forum selection clause in the passenger ticket contract and Defendant's Florida headquarters. (*See* New Trial Mot. 17). Defendant insists these latter factors cannot re-balance the remaining *Lauritzen* factors, which point directly to Wisconsin. (*See id.*).

Defendant's argument glosses over the fact the *Lauritzen* factors, at their core, aim to identify the state with the most significant relationship to the action. To determine the most significant relationship, courts consider the interests served by application of the laws in question. *See Rhoditis*, 398 U.S. at 308–09 ("The *Lauritzen* test, however, is not a mechanical one . . . The significance of one or more factors must be considered in light of the [] interest served by the assertion of [the law]." (alterations added; citations omitted)); *Calhoun*, 216 F.3d at 347 ("[W]e must also inquire into which state has the most dominant interest in having its law applied to this litigation." (alteration added)); *Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 891 (5th Cir. 1991) ("Modern choice of law analysis, whether maritime or not, generally requires the application of the law of the state with the 'most significant relationship' . . . [and] the application of the most

significant relationship approach does not simply turn on the number of contacts each state has with the controversy." (alterations added; citation omitted)).

While Defendant agrees *Lauritzen* requires the Court to focus on analyzing which state has the most significant relationship to the incident and the dominant interest in having that state's law applied (*see* New Trial Reply 9 (citation omitted)), it fails to engage in any interest analysis between the states, nor does it address Plaintiff's arguments regarding the purposes and policies underlying each state's law[10] (*see generally id.*). Defendant even agrees with Plaintiff's position Wisconsin will not apply its law of compensatory damages to any wrongful death that occurs outside Wisconsin. (*See* New Trial Resp. 22–23 (citation omitted); New Trial Reply 11 (citation omitted)).

The death here did not occur in Wisconsin, and the parties agree Wisconsin would not apply its wrongful death statute to this action. Defendant does not provide any explanation as to what Wisconsin's interest would be in having its law applied, nor does it cite any legal authority finding the state with the most significant relationship to an action is a state that has no applicable law that could apply to the action. Given the absence of any applicable Wisconsin law, Wisconsin does not have an interest in having its law applied to limit the remedies available to a Wisconsin plaintiff.

As discussed, Florida law, if applied, provides supplemental remedies. The Eleventh Circuit has identified two interests behind the compensatory damages provided by Florida's wrongful death statutes: (1) compensating Florida domiciliaries and (2) ensuring a compensatory

---

[10] Despite the substantial support provided in Defendant's Motion, Plaintiff chose not to engage in a maritime choice-of-law analysis. (*See* New Trial Resp. 16–23). Instead, Plaintiff incorrectly argued the Court's jurisdiction was based on diversity of citizenship and engaged in a Florida choice-of-law analysis as outlined in the Restatement (Second) of Conflicts of Law section 6. (*See id.*).

damages award against its own domiciliary defendant is not excessive. *See Piamba Cortes*, 177 F.3d at 1301. Because Florida "possesses no interest in compensating domiciliaries of other jurisdictions more richly than they would receive in their own courts," *id.*, the first interest is not implicated here. Courts have consistently found the second interest is implicated in actions where there is a domiciliary defendant.[11] Given the application of Florida law serves the underlying interests of the Florida statute while Wisconsin has no applicable law or interest in having its law applied, Florida has the most significant relationship to this case.

The Court does not agree with Defendant's contention "if Florida law supplements the general maritime law here, then it would do so for virtually any death case from any state's territorial waters brought against a cruise line headquartered in Florida with a local forum selection clause." (New Trial Reply 11). Florida law applies because Florida has the most significant relationship to the action, not simply because Defendant is headquartered in Florida and the passenger ticket-contract contains a forum selection clause. Indeed, if Wisconsin had an identifiable interest which would be furthered through the application of Wisconsin law, the Court's decision might come out differently. As explained, Wisconsin does not have an interest in having its laws apply — its laws do not apply outside the state — and the state with the most significant relationship is not determined by counting each state's contacts. *See Hellenic Lines Ltd. v. Rhoditis*, 412 F.2d 919, 922 (5th Cir. 1969) ("*Lauritzen* did not create a contact counting test."). As Florida has the most significant relationship to the action, Plaintiff's remedies under the general maritime law are supplemented by Florida law, which allows for the recovery of

---

[11] *See, e.g.*, *Piamba Cortes*, 177 F.3d at 1301 ("Florida nonetheless retains an interest in ensuring that a compensatory damages award against its own domiciliary defendants is not excessive."); *Hoy v. Sandals Resorts Int'l, Ltd.*, No. 11-24580-CIV, 2013 WL 6385019, at *5 (S.D. Fla. Dec. 6, 2013) (same); *Estate of Marin-Torres v. Gamo Outdoor USA, Inc.*, No. 14-22122-CIV, 2015 WL 11233089, at *6 (S.D. Fla. Mar. 30, 2015) (same).

damages for loss of companionship and protection and for mental pain and suffering. *See* Fla. Stat. § 768.21; *see also Piamba Cortes*, 177 F.3d at 1299. Consequently, Defendant's request for a remittitur on the basis that Wisconsin law limits Plaintiff's available remedies is denied.

b) Remittitur Under Rule 59(e)

A traditional request for a remittitur on the ground that the evidence does not support the amount of a jury's verdict is governed by Rule 59. *See Johansen v. Combustion Eng'g, Inc*., 170 F.3d 1320, 1331 (11th Cir. 1999). "A federal court has no general authority to reduce the amount of a jury's verdict . . . [since] . . . [t]he Seventh Amendment prohibits re-examination of a jury's determination of the facts, which includes its assessment of the extent of plaintiff's injury." *Id*. at 1328 (alterations added; citation omitted). Yet, "'a remittitur order reducing a jury's award to the outer limit of the proof is the appropriate remedy where the jury's damage award exceeds the amount established by the evidence.'" *Rodriguez v. Farm Stores Grocery, Inc*., 518 F.3d 1259, 1266 (11th Cir. 2008) (quoting *Goldstein v. Manhattan Indus., Inc*., 758 F.2d 1435, 1448 (11th Cir. 1985)). In such instances, "the plaintiff [must] be given the option of a new trial in lieu of remitting a portion of the jury's award." *Johansen*, 170 F.3d at 1329 (citing *Hetzel v. Prince William Cty.*, 523 U.S. 208 (1998) (alteration added)).

It bears emphasizing that remittitur is justified only when a verdict "is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the trier of fact may properly operate." *Bravo v. United States*, 532 F.3d 1154, 1161 (11th Cir. 2008) (internal quotation marks and citations omitted). "A party who assails the amount of a verdict as being excessive[] has the burden of showing it is unsupported by the evidence, or that the jury was influenced by passion or prejudice." *Bould v. Touchette*, 349 So. 2d 1181, 1184 (Fla. 1977) (alteration added; internal quotation marks and citation omitted).

Defendant's final attempt to disturb the jury's verdict is to seek a remittitur on the basis the jury's award exceeds the bounds of reasonable recovery. (*See* New Trial Mot. 19). Defendant argues remittitur is appropriate because Plaintiff's counsel inflamed the jury. (*See id*.). As Defendant describes, "the intended jury award of over $5 million for an elderly gentleman already in poor health likely was the result of . . . jurors' passion." (*Id*. 20 (alteration added)).

Because Florida law supplements the general maritime law and provides the remedies now challenged, the Court looks to Florida law in considering whether the damages awarded by the jury are excessive. *See Quality Foods, Inc. v. U.S. Fire Ins. Co*., 715 F.2d 539, 542 n.2 (11th Cir. 1983) (finding the determination of whether a jury verdict is excessive is a question of state substantive law, while the determination of whether a new trial should be granted is a question of federal law).[12] The Court must consider the factors in section 768.74, Florida Statutes, when determining whether a damage award is excessive.[13] *See Moreno v. Diaz*, 943 So. 2d 1011, 1013 (Fla. 3d DCA 2006).

---

[12] The Court in *Quality Foods* exercised jurisdiction based on diversity of citizenship. *See id*. Yet, the undersigned finds the proposition applicable in this case arising under admiralty jurisdiction.

[13] Section 768.74(5) identifies the following criteria:

> (a) Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact;
>
> (b) Whether it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable;
>
> (c) Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture;
>
> (d) Whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered; and
>
> (e) Whether the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.

Fla. Stat. § 768.74(5).

Defendant has failed to show "the jury's damage award exceeds the amount established by the evidence." *Rodriguez*, 518 F.3d at 1266 (internal quotation marks and citation omitted). Certainly, Defendant fails to support its request for remittitur with any showing beyond its often-repeated opinion the jury verdict was excessive, likely caused by the Court's rulings which allowed Plaintiff's counsel to attack defense counsel's credibility. (*See* New Trial Mot. 20). "The fact that a damage award is large does not in itself render it excessive nor does it indicate that the jury was motivated by improper consideration in arriving at the award." *Allred v. Chittenden Pool Supply, Inc.*, 298 So. 2d 361, 365 (Fla. 1974) (alteration added; citation omitted).

Furthermore, Defendant does not even provide a suggested amount for the Court to reduce the Judgment to. *See Hendry v. Zelaya*, 841 So. 2d 572, 575 (Fla. 3d DCA 2003) ("We do not consider a motion for remittitur or additur which never suggests a figure to be a proper motion under the statute."). While the Court agrees the amount awarded for loss of companionship and protection and for mental pain and suffering is large, a "court should never declare a verdict excessive merely because it is above the amount which the court itself considers the jury should have allowed." *Ashcroft v. Calder Race Course, Inc.*, 492 So. 2d 1309, 1314 (Fla. 1986); *see also Odom v. R.J. Reynolds Tobacco Co.*, 254 So. 3d 268, 276 (Fla. 2018) ("[T]his Court has recognized that measuring noneconomic damages is inherently difficult" and "has determined that '[t]he jury, guided by its judgment and everyday life experiences, is in the best position to make a fair assessment of these damages.'" (first alteration added; quoting *Angrand v. Key*, 657 So. 2d 1146, 1149 (Fla. 1995))).

### III.    CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** as follows:

1. Defendant's Rule 50(b) Motion for Judgment as a Matter of Law **[ECF No. 161]** is

   **DENIED**.

2. Defendant's Motion for New Trial or Remittitur **[ECF No. 160]** is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 1st day of October, 2019.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record